Minute Order Form (06/97)

JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3956 | **DATE** | 3/15/2001 |
| **CASE TITLE** | Margaret Gall vs. Liberty Mutual Insurance Group | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [16-1] is granted. Plaintiff's motion for summary judgment [19-1] is denied. Judgment is hereby entered in favor of the defendant Liberty Mutual Insurance Group and against plaintiff Margaret Gall. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 1 6 2001 date docketed | | |
| ✓ | Docketing to mail notices. | | | 28 |
| ✓ | Mail AO 450 form. | | IS docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 MAR 15 PM 2:57 | | |
| RO | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARGARET GALL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 00 C 3956 |
| v. ) | |
| ) | Judge Ruben Castillo |
| LIBERTY MUTUAL INSURANCE ) | |
| GROUP, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Margaret Gall ("Gall") sues her former employer, Liberty Mutual Insurance Group ("Liberty"), pursuant to § 502(a)(1)(B) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Specifically, Gall seeks benefits that she claims are due her under a severance policy (the "Policy") but were denied her by Liberty. The parties' cross-motions for summary judgment are presently before the Court. For the reasons set forth below, we grant summary judgment for Defendant and deny Plaintiff's motion.

## RELEVANT FACTS

### I. The Policy

In November 1989, Guardian Royal Exchange Insurance Group ("GRE") adopted its Severance Policy. The Policy is governed by ERISA and has the stated purpose of attracting and retaining "well qualified individuals for its management team." (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ. J., Tab B, Gall Dep. Ex. 9, Severance Policy Overview.) The Policy entitles employees to receive severance benefits if they terminate their employment for "Good Reason." (*Id.*, Severance Policy § II.) The Policy defines "Good Reason" as:

(1) your being placed, without your consent, in a position of lesser stature than that of your then outstanding position with the Company or being assigned duties or responsibilities inconsistent with such position; or (2) the Company discontinuing or reducing your compensation or other material benefits other than as part of reduction of compensation for executive employees of the Company generally.

(*Id.*, Severance Policy § II(c).) In addition, the Policy grants GRE sole discretion in its administration. (*Id.*, Severance Policy § IV.)

## II. Gall's Employment with GRE

In February 1997, Margaret Gall was recruited and hired by American Ambassador Casualty Company ("AACC"), based in Schaumburg, Illinois. AACC was owned by GRE, based in Indianapolis, Indiana. AACC underwrote insurance in Illinois, Florida, Georgia, Tennessee, Kentucky and Indiana. As Vice President/General Manager, Gall was the highest-level employee at AACC and was in charge of 250-300 people. The Vice Presidents of Accounting, Claims, Underwriting and Human Resources reported to Gall. Gall, along with the Vice President/General Managers of GRE's other specialty auto insurance companies, reported to Mark Budde, Senior Vice President of GRE. Gall's starting salary was $140,000.

In August 1998, GRE acquired The Netherlands Insurance Company ("TNIC") and began restructuring GRE according to the TNIC model. In late 1998, the claims departments of GRE's specialty auto insurance companies, including AACC, began reporting directly to the GRE corporate financial department in Indianapolis.

## III. Gall's Use of a Company Car

When Gall was hired by GRE, she was given the use of a company car, for which all gas and maintenance were paid. In addition, she received reimbursement for any tax liability resulting from the use of the car, known as a "gross-up." The company car was particularly

2

significant to Gall because she commuted over 120 miles round trip to work each day. In December 1998, Gall was informed that she and all other Vice President/General Managers would no longer have the use of a company car. Instead, they would be given a one-time payment of $5,000 and an annual car allowance of $10,000 per year. (R. 18, Def.'s 56.1(a)(3) Statement of Facts ¶ 37.) Gall spoke to Budde about retaining her car because the car allowance would not adequately reimburse her for the expenses resulting from her lengthy commute. As a result of this discussion, Gall was able to keep her car until June 1999. Thereafter, she rented a car at company expense while the issue continued to be addressed.

In May 1999, after Liberty purchased GRE, the company decided to make an exception to its car policy and allowed Gall to have a company car. (*Id.* at ¶¶ 46-47.) Liberty did not reimburse Gall for any resulting tax liability, which totaled $8,904 the previous year. Liberty, however, did allow Gall to keep the $10,000 car allowance she had already received.

## IV. Gall's Employment with Liberty

As a result of Liberty's purchase of GRE and Liberty's desire to standardize employee titles throughout the company, Gall and all other GRE Vice President/General Managers were renamed Regional Vice Presidents. The accounting departments were brought under corporate control and the accounting staff of AACC was moved to the Indianapolis office. In September 1999, AACC's in-house legal department began to report directly to Liberty's corporate legal department in Boston, Massachusetts. Gall remained the highest-level employee at AACC, responsible for overseeing the Chicago-area operation. As a result of Liberty's purchase of GRE, however, Gall no longer directly oversaw the claims, accounting or legal departments, and she no longer had authority to sign settlement drafts. Moreover, it took longer for Gall to get checks

issued, and she had to go through GRE's corporate offices to get AACC statistics.

**V. Gall's Resignation and Claim for Benefits**

On August 24, 1999, Gall informed Budde that she intended to resign her position. In her resignation letter, she stated, "I am resigning as a result of Liberty Insurance Holdings having changed my position with the company earlier this month and the elimination of the benefit for the "gross-up" on the company car." (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ. J., Tab B, Gall Dep. Ex. 8, Gall Resignation Letter.) Gall claimed that her resignation was for "Good Reason" and that, therefore, she was entitled to severance benefits under the Policy. (*Id.*) Budde told Gall that he did not think she was eligible for benefits but that Richard Hyatt, Liberty's Vice President of Human Resources, would make the final decision.

Between August 24, 1999, and September 7, 1999, Gall corresponded with Hyatt regarding her claim for severance benefits under the Policy. Gall provided Hyatt with an email briefly describing her reasons for claiming benefits. Gall cited the following two reasons: (1) her position was changed from Vice President/General Management to Regional Vice President, which she believed reflected "a reduction in duties, reduced level of authority over various company functions and an overall decreased level in responsibility"; and (2) she no longer was receiving the tax gross-up for her car allowance. (*Id.*, Gall Dep. Ex. 11, Gall Email to Hyatt.)

On November 5, 1999, in response to Gall's email, Hyatt sent a letter to Gall's attorney, Alexander Lourie, indicating that Liberty had denied her request for benefits. Hyatt explained that: (1) the change in Gall's job title "was part of the transition from the former company structure to the new company structure . . . [and] did not impact Mrs. Gall's compensation and was in no way a placement in a position of lesser stature"; and (2) the elimination of the tax

4

"gross-up" for use of the company car "was part of a company-wide program change . . . unrelated to the title change . . . [and] [i]n view of Mrs. Gall's total compensation package, this was not a material change in benefits." (*Id.*, Gall Dep. Ex. 12, Hyatt Letter to Lourie.)

Presently before this Court are the parties' cross-motions for summary judgement. Gall argues that this Court should apply an abuse of discretion standard of review of Liberty's denial of severance benefits and that, under this standard, Liberty's decision is incorrect. Alternatively, Gall argues that, even under an arbitrary and capricious standard of review, she is entitled to severance benefits because Liberty's decision is unreasonable. Liberty, on the other hand, urges this Court to apply an arbitrary and capricious standard of review and argues that its decision to deny severance benefits to Gall is neither unreasonable under this standard nor incorrect under an abuse of discretion standard. Applying an arbitrary and capricious standard of review, we find that Liberty's denial of severance benefits under the Policy is not unreasonable. Therefore, we grant summary judgement for Liberty and deny Gall's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all evidence in a light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted.

5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When both parties seek summary judgment, the court will "look to the burden of proof that each party would bear on an issue at trial; [the court] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## ANALYSIS

### I. Standard of Review

In analyzing an ERISA claim under § 1132(a), we must first determine the appropriate standard of review. The Supreme Court set forth the applicable basic rule in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In *Firestone*, the Court explained that *de novo* review of an ERISA plan administrator's determination to deny benefits is the default rule "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id. See also Hertzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000) (conferral of discretion not to be assumed). Where a plan confers discretionary power on the plan administrator to interpret the plan, the arbitrary and capricious standard governs, and our review is deferential. *See, e.g., Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998).

In the case at bar, we look to the language of the Policy to determine whether it grants discretion to the plan administrator. *See Hertzberger*, 205 F.3d at 329. Here, the Policy clearly confers discretion to the company. Section IV of the Policy states that, "[t]he Company has the sole discretion in the administration of this Severance Policy and may modify its provisions in individual cases." (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ J., Tab B, Gall Dep. Ex.

6

9, Severance Policy § IV.) When an ERISA plan contains such language, the Seventh Circuit has consistently held that the appropriate standard of review is the "arbitrary and capricious" standard.[1] *See Hertzberger*, 205 F.3d at 331. Under this standard, "our role is limited" in reviewing the plan administrator's decision to deny benefits, *James v. Gen. Motors Co.*, 230 F.3d 315, 316 (7th Cir. 2000), and we will only disturb the administrator's decision if it is "downright unreasonable." *Chojnacki v. Ga.-Pac. Corp.*, 108 F.3d 810, 816 (7th Cir. 1997).

### A. Conflict of Interest

As the Supreme Court noted in *Firestone*, although the existence of a conflict of interest on the part of the plan administrator does not alter the applicable standard of review, that conflict must be weighed as a factor in determining whether there has been a breach of duty even under the arbitrary and capricious standard. *Firestone*, 489 U.S. at 115. We presume, however, that an administrator is acting neutrally unless the plaintiff shows, by providing specific evidence of actual bias, that there is a significant conflict. *Mers*, 144 F.3d at 1020.

Gall contends that we should make a more probing inquiry into Liberty's decision to deny severance benefits to Gall because "Hyatt is not an independent administrator but an employee of Liberty Mutual and as such has an inherent conflict of interest in the administration of the 'plan'." (R. 23-1, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4.) We disagree. The

---

[1] Gall argues that the standard we should apply "is whether the decision was an abuse of discretion, not whether it was 'arbitrary and capricious' as claimed by the defendant." (R. 23-1, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.) The Seventh Circuit has held that these standards of review are interchangeable. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 921 (7th Cir. 1996) (stating that the issue to be decided was whether "Amoco had abused its discretion, or, what amounts to the same thing, had acted arbitrarily and capriciously"). Therefore, we reject Gall's argument and proceed to review Liberty's decision to deny severance benefits to Gall under the arbitrary and capricious standard.

7

Seventh Circuit has held that corporate officers can "double" as plan administrators because "the impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrator's partiality." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). Here, Gall presents no specific evidence that Hyatt had a conflict of interest in his role as Liberty's plan administrator for the Policy. Therefore, we do not consider this unsubstantiated conflict as a factor in determining whether Liberty has breached its duty under the arbitrary and capricious standard.

### B. Plan Administration Responsibility

Finally, Gall maintains that "there is a genuine issue of material fact as to whether Mr. Hyatt was the plan's administrator regarding the severance package . . . [because] there is no documentation naming Richard Hyatt as the Plan Administrator." (R. 23-1, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4.) We disagree. As we noted earlier, the Policy states that "[t]he Company has the sole discretion in the administration of this Severance Policy." (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ J., Tab B, Gall Dep. Ex. 9, Severance Policy § IV.) We believe that, pursuant to the Policy, it is not unreasonable that Liberty assigned Hyatt, the Vice President of Human Resources, the responsibility for deciding claims under the Policy. Thus, we find no genuine issue for trial with respect to this aspect of Gall's claim, and we turn now to the "reasonableness" of Liberty's decision to deny severance benefits to Gall under the Policy.

## II. Denial of Severance Benefits under the Policy

In order for Gall to be entitled to severance benefits under the Policy, she must have terminated her employment for "Good Reason." (*Id.*, Severance Policy Overview.) Therefore, Gall must show that: (1) she was placed in a position of lesser stature or was assigned duties or

8

responsibilities inconsistent with her position; or (2) her compensation or other material benefits were reduced other than as part of a reduction for executive employees of GRE in general. (*Id.*, Severance Policy § II(c).) We emphasize that, under the extremely deferential arbitrary and capricious standard, we will not interfere with Liberty's decision unless it was a "downright unreasonable" interpretation of the Policy. *See Chojnacki*, 108 F.3d at 816.

### A. Change in Gall's Job Title and Responsibilities

Gall contends that the change in her job title from Vice President/General Manager to Regional Vice President reflected an overall reduction in her duties, authority and responsibility, and qualifies as "a position of lesser stature" under the Policy. (R. 23-1, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8.) The record, however, does not support Gall's contention. In May 1999, after Liberty purchased GRE, the job title of all AACC Vice President/General Managers was changed to Regional Vice President. The change in Gall's job title was part of Liberty's company-wide effort to standardize executive titles after its purchase of GRE. (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ. J., Tab B, Gall Dep. Ex. 12, Hyatt Letter to Lourie.) As a result, all employees in parallel positions to Gall underwent the same change in job title. The facts indicate that this change was in name only and that Gall and the other Regional Vice Presidents remained the highest-level employees at their respective specialty auto groups. Therefore, the change in Gall's job title merely reflected Liberty's restructuring efforts and was not a delegation to "a position of lesser stature" under the Policy.

Gall also argues that, after Liberty purchased GRE, she was placed in "a position of lesser stature" when the claims, accounting, human resources and legal departments came under corporate control. The heads of these departments no longer reported directly to Gall. In

9

addition, Gall no longer had signing authority on settlement drafts or checks, and she had to go through GRE's corporate offices in Indianapolis to get AACC statistics. Finally, Gall points out that, before Liberty purchased GRE, she oversaw 250-300 employees.[2]

Based on a careful review of the record, we believe that Liberty's denial of Gall's claim was not an arbitrary and capricious decision under the Policy. While there can be no doubt that Gall's responsibilities were altered after Liberty purchased GRE, Liberty's determination that these changes were "in no way a placement in a position of lesser stature" is not downright unreasonable. (*Id.*) Gall remained the highest-level employee at AACC, and she continued to report directly to Budde, the Senior Vice President at GRE. Gall produces no specific evidence indicating that AACC's business decreased or that the number of employees she oversaw diminished. Although Gall experienced some inconveniences as a result of being integrated into a larger corporation and being subject to its policies, we do not believe that Gall's having to go through GRE's corporate offices to get checks signed and to get AACC statistics placed her "in a position of lesser stature." Finally, despite the removal of the accounting, claims, human resources and legal departments from Gall's direct control, the record indicates that, like the company-wide change in job titles, this was a change in name only and did not place Gall "in a position of lesser stature." Given these facts and the deference we must accord to a plan administrator under the arbitrary and capricious standard, we believe that Liberty's decision to deny Gall's claim for severance benefits was not downright unreasonable.

---

[2] We emphasize that Gall does not indicate the number of employees she oversaw after Liberty purchased GRE, so we have no way of knowing whether, or by how much, this number changed.

10

### B. Change in Company Car Policy

Gall argues that she experienced a reduction in material benefits under the Policy when the company car policy was changed and the tax "gross-up" for her car allowance was eliminated. (*Id.*, Gall Dep. Ex. 11, Gall Email to Hyatt.) We disagree. The Policy explicitly excludes from the definition of "Good Reason" any "reduction of compensation for executive employees of the Company generally." (*Id.*, Gall Dep. Ex. 9, Severance Policy § II(c)(2).) It is undisputed that the change in Gall's use of a company car "was part of a company-wide program change for company car drivers." (*Id.*, Gall Dep. Ex. 12, Hyatt Letter to Lourie.) As such, all GRE Regional Vice Presidents, including Gall's supervisor Budde, lost their cars. The company-wide nature of the car policy change removes it from the definition of "Good Reason" under the Policy.[3] Therefore, we find that Liberty was not downright unreasonable in determining that this was not a reduction of Gall's material benefits under the Policy.

### C. Gall's Reliance Upon Nancy Miller's Statements

Gall argues that she reasonably relied upon verbal advice from Nancy Miller, AACC's Human Resources Manager, that Gall would be eligible for severance benefits under the Policy. Gall claims she did not know she would be denied benefits until after she resigned, and that she should have been advised prior to her resignation that she would not be eligible for benefits. The Seventh Circuit, however, has held that ERISA does not permit the oral modification of

---

[3] Gall does not address the fact that this aspect of her claim is explicitly excluded by § II(c)(2) of the Policy. Rather, she focuses her complaints on the fact that the car allowance given to employees in lieu of the use of a company car would not adequately reimburse her for the expenses resulting from her lengthy commute. In answer to this argument, we note that Liberty made an exception to its company-wide car policy, permitting Gall to lease a car at company expense and allowing her to keep the $10,000 car allowance. This more than made up for the $8,904 loss of tax liability reimbursement for Gall's car usage in 1998.

11

substantive provisions of a written ERISA plan. *See Doe v. Blue Cross & Blue Shield United,* 112 F.3d 869, 875-76 (7th Cir. 1997); *Plumb v. Fluid Pump Serv., Inc.,* 124 F.3d 849, 856 (7th Cir. 1997) (stating that "if the written terms of an ERISA plan do not entitle the claimant to the coverage sought, benefits will not be forthcoming on the basis of oral representations to the contrary"). As such, Gall's reliance on a telephone conversation with Miller, who did not have decision-making authority and who did not provide anything in writing to Gall, was misplaced. Thus, we reject Gall's reliance argument.

### D. Unequal Treatment

Gall complains that she was the only GRE employee denied benefits when between fifty to one hundred other employees were offered severance packages as a result of the company's restructuring. She specifically identifies three employees, David Blum, Sandra Hayes and Richard Stein, who were offered severance benefits after a reduction in their job titles from Vice President/Director to Assistant Vice President and the elimination of their car allowances, equal to approximately ten percent of their annual incomes. None of these individuals, however, was in the same position as Gall. Gall's title was changed from Vice President/General Manager to Regional Vice President and the loss of her tax liability reimbursement was more than offset by the $10,000 car allowance she was allowed to keep. Therefore, Liberty's decision to grant benefits to Blum, Hayes and Stein while denying benefits to Gall was eminently reasonable.

Finally, Gall claims there is a requirement to administer the Policy consistently, and she believes that she was entitled to an explanation as to why she was denied benefits while other employees were granted benefits. We first note that Gall has cited no authority, and our own independent research has not revealed any, in support of her argument that a denial of benefits

determination must include a comparison to other severance benefit decisions made by a plan administrator. Instead, ERISA requires that "every employee benefit plan shall -- (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). Liberty satisfied this duty when Hyatt sent his letter, dated November 5, 1999, to Gall's attorney, setting forth the specific reasons why Gall's request for severance benefits was denied. (R. 17, Def.'s App. in Supp. of Def.'s Mot. for Summ. J., Tab B, Gall Dep. Ex. 12, Hyatt Letter to Lourie.) Therefore, Gall's unequal treatment allegations do not affect our conclusion that Liberty's denial of severance benefits to Gall was not an arbitrary and capricious determination under the Policy.

## CONCLUSION

Because Liberty's decision to deny Gall's claim was not arbitrary and capricious, we grant Defendant's motion for summary judgment. (R. 16-1.) Plaintiff's motion for summary judgment is denied. (R. 19-1.) The Clerk of the Court is directed to enter judgment pursuant to Fed. R. Civ. P. 58 in favor of Defendant and against Plaintiff.

Entered:

*[signature]*

Judge Ruben Castillo
United States District Court

Dated: March 15, 2001

13